UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

ROBERT LEON RAYMOND, JR.,      )
                                )
    Plaintiff                   )
                                )
v.                              )   No. 1:12-cv-374-GZS
                                )
CAROLYN W. COLVIN,              )
Acting Commissioner of Social Security,[1] )
                                )
    Defendant                   )

**REPORT AND RECOMMENDED DECISION**[2]

This Social Security Disability ("SSD") and Supplemental Security Income ("SSI") appeal raises the question of whether the administrative law judge supportably found the plaintiff capable of performing work existing in significant numbers in the national economy. The plaintiff seeks reversal and remand on the bases that the administrative law judge (i) failed to make specific credibility resolutions, (ii) omitted consideration of key aspects of the plaintiff's mental condition, including difficulty handling perceived stress and controlling his impulses, (iii) applied an incorrect standard in assessing the plaintiff's social functioning, (iv) failed to take into account the plaintiff's difficulty handling perceived stress and controlling his impulses, in evaluating his ability to perform the jobs of garbage collector and vehicle cleaner, (v) did not adequately address the vocational expert's testimony on cross-examination, and (vi) erred in determining that the plaintiff engaged in substantial gainful activity ("SGA") in 2006. *See*

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Carolyn W. Colvin is substituted as the defendant in this matter.
[2] This action is properly brought under 42 U.S.C. §§ 405(g) and 1383(c)(3). The commissioner has admitted that the plaintiff has exhausted his administrative remedies. The case is presented as a request for judicial review by this court pursuant to Local Rule 16.3(a)(2)(A), which requires the plaintiff to file an itemized statement of the specific errors upon which he seeks reversal of the commissioner's decision and to complete and file a fact sheet available at the Clerk's Office. Oral argument was held before me on December 12, 2013, pursuant to Local Rule 16.3(a)(2)(D), requiring the parties to set forth at oral argument their respective positions with citations to relevant statutes, regulations, case authority, and page references to the administrative record.

1

Itemized Statement of Errors Pursuant to Local Rule 16.3 Submitted by Plaintiff ("Statement of Errors") (ECF No. 16) at 1-16. I find no reversible error and, accordingly, recommend that the court affirm the decision.

Pursuant to the commissioner's sequential evaluation process, 20 C.F.R. §§ 404.1520, 416.920; *Goodermote v. Secretary of Health & Human Servs.*, 690 F.2d 5, 6 (1st Cir. 1982), the administrative law judge found, in relevant part, that the plaintiff met the insured status requirements of the Social Security Act through March 31, 2005, Finding 1, Record at 14; that he had engaged in SGA since December 1, 2000, his alleged onset date of disability, Finding 2, *id.*; that, since his date last insured, he had exhibited severe impairments of a history of polysubstance abuse and personality disorder NOS [not otherwise specified]/personality disorder, Finding 3, *id.* at 15; that he retained the residual functional capacity ("RFC") to perform a full range of work at all exertional levels, could understand and remember simple to moderately detailed instructions, could execute simple to moderately detailed tasks on a consistent schedule to complete a workday/workweek, could interact with co-workers and supervisors but not with the general public, should not be involved in cooperative, production-oriented tasks, and could adapt to occasional changes in the workplace, Finding 5, *id.* at 16; that, considering his age (32 years old, defined as a younger individual, on his alleged disability onset date, December 1, 2000), education (high school), work experience (transferability of skills immaterial), and RFC, there were jobs existing in significant numbers in the national economy that he could perform, Findings 7-10, *id.* at 22; and that he, therefore, was not disabled as of his date last insured or at any time from then through the date of the decision, July 24, 2011, Finding

11, *id*. at 23.[3] The Appeals Council declined to review the decision, *id*. at 1-3, making the decision the final determination of the commissioner, 20 C.F.R. §§ 404.981, 416.1481; *Dupuis v. Secretary of Health & Human Servs.*, 869 F.2d 622, 623 (1st Cir. 1989).

The standard of review of the commissioner's decision is whether the determination made is supported by substantial evidence. 42 U.S.C. §§ 405(g), 1383(c)(3); *Manso-Pizarro v. Secretary of Health & Human Servs.*, 76 F.3d 15, 16 (1st Cir. 1996). In other words, the determination must be supported by such relevant evidence as a reasonable mind might accept as adequate to support the conclusion drawn. *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *Rodriguez v. Secretary of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981).

The administrative law judge reached Step 5 of the sequential evaluation process, at which stage the burden of proof shifts to the commissioner to show that a claimant can perform work other than his past relevant work. 20 C.F.R. §§ 404.1520(g), 416.920(g); *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Goodermote*, 690 F.2d at 7. The record must contain substantial evidence in support of the commissioner's findings regarding the plaintiff's RFC to perform such other work. *Rosado v. Secretary of Health & Human Servs.*, 807 F.2d 292, 294 (1st Cir. 1986).

---

[3] Although, for purposes of the plaintiff's application for SSD benefits, he was required to demonstrate that he was disabled on or before his date last insured, March 31, 2005, SSI benefits are not tied to a claimant's date last insured. *See Splude v. Apfel*, 165 F.3d 85, 87 (1st Cir. 1999) ("In 1972, Congress added a new social security program to provide 'supplemental security income' (called 'SSI') for 'aged, blind and disabled' persons of limited means regardless of their insured status. This is a social welfare program funded out of general taxpayer revenues. SSI is available even to those who qualify for SSD, but SSD income is considered in determining whether a disabled person qualifies for SSI under the latter's means test.") (citations omitted); *Chute v. Apfel*, No. 98-417-P-C, 1999 WL 33117135, at *1 n.2 (D. Me. Nov. 22, 1999) ("To be eligible to receive SSD benefits the plaintiff had to have been disabled on or before her date last insured (March 31, 1995); however, eligibility for SSI benefits is not dependent on insured status.").

## I. Discussion

### A. Credibility Determination

The plaintiff challenges the administrative law judge's credibility finding on two fronts: that he (i) failed to specify which of the plaintiff's statements he credited or discredited, as a result of which one cannot tell whether he discredited portions that would have supported a far more restrictive RFC, and (ii) offered rationales for his credibility finding that do not withstand close scrutiny. *See* Statement of Errors at 1-3. I find no reversible error.

The administrative law judge stated:

> After careful consideration of the evidence, the undersigned finds that the [plaintiff's] medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, his testimony and statements of record concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above [RFC] assessment.
>
> The [plaintiff] has <u>little credibility</u>, particularly about employment in 2006. There is no corroborative evidence from the employer. <u>It is noted that some providers have indicated that the [plaintiff] is not forthcoming</u> (Exhibits 1F and 22F/1). In addition, the [plaintiff's] criminal history detracts from credibility. <u>Also, there is very little medical evidence of repeated cutting behavior. The [plaintiff] over-reports his symptoms.</u>

Record at 17 (emphasis in original).

With respect to the plaintiff's first point, his counsel contended at oral argument that the administrative law judge abdicated his job of assessing credibility by failing to make any findings as to whether he credited the key testimony as to the plaintiff's dysfunction: for example, that the plaintiff had impulse control problems so significant that they caused him to perceive others at work as aggressors, triggering a fight or flight response, and that, at his last job, he left work early virtually every day because he could not handle the stress. His counsel pointed out that, according to the vocational expert who testified at his client's hearing, an individual with those problems would be unemployable. *See id.* at 118.

While it is true that the administrative law judge did not analyze, statement by statement, which allegations he credited or discredited, he made clear that, overall, he found the plaintiff to have "little credibility," and specifically, he discredited any claimed restrictions inconsistent with those set forth in his mental RFC determination. *Id*. at 17. Put differently, he found that if the plaintiff obtained work consistent with the assessed limitations (for example, involving no work with the general public, no cooperative, production-oriented tasks, and only occasional changes in the workplace), he retained the capacity to work full-time despite his impulse control and other problems. This was a sufficient elucidation of the extent to which he found the plaintiff's allegations credible.

With respect to the plaintiff's second point, the plaintiff's counsel contended at oral argument that none of the four bases given for the adverse credibility determination is appropriate and/or supported by substantial evidence. Counsel for the commissioner protested that the plaintiff had waived this argument by failing to include it in his statement of errors. Alternatively, she contended that, while two of the four bases were not supported by substantial evidence – those pertaining to the plaintiff's employment in 2006 and to his cutting history – the remaining two were, entitling the credibility finding to deference pursuant to the governing standards set forth by this court and the First Circuit. *See Vining v. Astrue*, 720 F. Supp.2d 126, 138 (D. Me. 2010) ("This court has rejected the notion that an administrative law judge must slavishly discuss all factors relevant to analysis of a claimant's credibility and complaints of pain in order to make a supportable credibility finding. Administrative law judges' credibility findings are entitled to deference, especially when supported by specific findings. *See, e.g., Frustaglia v. Secretary of Health & Human Servs.*, 829 F.2d 192, 195 (1st Cir. 1987) ('The credibility determination by the ALJ, who observed the claimant, evaluated his demeanor, and

considered how that testimony fit in with the rest of the evidence, is entitled to deference, especially when supported by specific findings.')") (citation omitted).

In his statement of errors, the plaintiff did challenge two of the administrative law judge's four bases for his credibility determination: those pertaining to his employment in 2006 and his criminal history. *See* Statement of Errors at 2-3 & n.2. However, he waived any challenge to the remaining two. *See, e.g., Farrin v. Barnhart,* No. 05–144–PH, 2006 WL 549376, at *5 (D. Me. Mar. 6, 2006) (rec. dec., *aff'd* Mar. 28, 2006) ("Counsel for the plaintiff in this case and the Social Security bar generally are hereby placed on notice that in the future, issues or claims not raised in the itemized statement of errors required by this court's Local Rule 16.3(a) will be considered waived and will not be addressed by this court.") (footnote omitted).

Even assuming *arguendo* that these challenges had not been waived, and even taking into account the commissioner's concession that the administrative law judge's reliance on two of the four bases for the credibility finding was misplaced, I conclude that the credibility finding is adequately supported by the remaining two bases and, hence, is due deference pursuant to *Vining* and *Frustaglia*. *See, e.g., Swain v. Astrue*, No. 2:10-cv-325-DBH, 2011 WL 2559538, at *5 (D. Me. June 27, 2011) (rec. dec., *aff'd* July 15, 2011) ("Even if the plaintiff's challenges to these three findings by the administrative law judge were credited and the findings excluded, the opinion includes sufficient discussion to satisfy the requirement that a credibility assessment be supported by substantial evidence.").

First, the evidence amply supports the administrative law judge's finding that the plaintiff was noted not to be forthcoming and to have overreported his symptoms. In a detailed summary of the evidence following the above-quoted credibility finding, the administrative law judge noted that, (i) in the context of the plaintiff's admission to the Maine General Medical Center

("MGMC") psychiatric unit in November 2006, Thomas Sneed, M.D., noted that "collateral information obtained from the [plaintiff's] probation officer indicated that he tended to be somewhat manipulative[,]" Record at 17 (emphasis in original), (ii) in notes documenting a March 14, 2007, MGMC emergency room visit, Dr. Sneed noted that the plaintiff "did not appear to be forthcoming with an accurate representation of his psychiatric symptoms and that his behaviors appeared quite normal and calm, whereas his complaints were quite severe, particularly about auditory hallucinations. Psychiatric testing was obtained which showed that the [plaintiff] was grossly exaggerating his psychiatric symptoms[,]" *id*. (emphasis in original), (iii) Louisa Barnhart, M.D., also evaluated the plaintiff psychiatrically at that time and noted that he had a significant substance abuse history, which appeared to be substantially minimized, and had obtained Klonopin from multiple providers, *see id*. at 17-18, (iv) a consulting physician, Dana Sattin, Ph.D., concluded that the plaintiff was "likely exaggerating his symptoms in an attempt to obtain psychological support and . . ., if there [were] any secondary gains from exhibiting severe psychopathology, the elevated profile could be due to malingering[,]" *id*. at 18, (v) Thomas Hallee, M.D., noted on January 22, 2009, that the plaintiff "did not appear to be experiencing hallucinations or responding to internal stimuli, and did not appear to be delusional[,]" *id*. at 19, (vi) Jonathan Freedman, licensed psychologist, noted on March 27, 2009, that, despite the plaintiff's reports of auditory hallucinations telling him to cut himself or overdose, "there were no outward behavioral signs of auditory hallucinations observed[,]" *id*., (vii) agency examining consultant R. Keith Hansen, Psy. D., found no evidence of hallucinations or delusions on August 5, 2009, *see id*., and (viii) the plaintiff was noted on February 23, 2011,

during an evaluation by OHI Community Integration Assessment not to be "forthcoming during the assessment[,]" *id.* at 20 (internal quotation marks omitted).[4]

At oral argument, the plaintiff's counsel did not deny that, on several occasions, his client was noted not to be forthcoming, but he contended that this was attributable to his personality disorder and that discrediting his testimony on that basis was akin to discrediting the testimony of a sociopath because he or she has lied, when lying is a symptom of that condition. Nonetheless, the plaintiff's counsel pointed to no record evidence attributing the above-described inconsistencies and exaggerations to the plaintiff's personality disorder. This is not a self-evident proposition. Indeed, as noted above, at least one treating source, Dr. Sattin, questioned whether the plaintiff was malingering. The plaintiff's challenge to this basis for the credibility finding, hence, falls flat.

With respect to criminal history, the plaintiff correctly points out that the administrative law judge failed to explain why he found that this history detracted from the plaintiff's credibility. *See* Statement of Errors at 3 & n.2; *see also* Record at 17-21. In his summary of the evidence, the administrative law judge noted that the plaintiff had been imprisoned for the molestation of his 16-year-old stepdaughter. *See* Record at 17.

During a colloquy with me at oral argument, the plaintiff's counsel acknowledged that, pursuant to Federal Rule of Evidence 609, felony convictions (that is, crimes punishable by death or imprisonment in excess of one year), as well as convictions for crimes involving a dishonest act or false statement regardless of the punishment, can be admissible to attack a witness's

---

[4] The administrative law judge noted that treating records from Maine Correctional Center extending to June 2010 described the plaintiff as experiencing auditory hallucinations, including a hallucination in which a black, ugly figure followed him around. *See* Record at 20. However, he found that "[s]ignificantly, the records from Maine Correctional Center are not supported by the majority of the medical record, and it appears that their assessments are based primarily on the [plaintiff's] self-reporting." *Id.*

character for truthfulness. *See* Fed. R. Evid. 609(a). However, he argued that, in this case, the administrative law judge failed to clarify that this – or any other reason – was the basis for his finding. He added that, in any event, the plaintiff's criminal history, which included sexual abuse of a dog and assaults as well as the molestation of his stepdaughter, bolstered his credibility because it tended to corroborate his allegation that he was unable to control his impulses.

While it is possible that the plaintiff's crimes stemmed from or otherwise reflected his mental health impairments, the plaintiff's counsel points to no expert evidence so stating, and it seems to me that such evidence would be required. "[T]he burden remains with the claimant at the stage of the process in which RFC is determined." *Sawyer v. Colvin,* No. [ ] 1:12–cv–231–JAW, 2013 WL 1760534, at *4 (D. Me. Mar. 30, 2013) (rec. dec., *aff'd* Apr. 24, 2013).

My research reveals that, in the context of Social Security appeals, and consistent with Federal Rule of Evidence 609, "some courts have accepted conviction of a felony as a basis for a negative credibility finding[,]" although "other courts have limited the range of convictions to those involving moral turpitude[.]" *Hubbard v. Astrue*, No. 1:07-cv-01225-SMS, 2009 WL 2488152, at *8 (E.D. Cal. Aug. 13, 2009). *See also Rivera v. Colvin*, No. EDCV 13-160 JC, 2013 WL 3879722, at *4 (C.D. Cal. July 26, 2013) ("In assessing the claimant's credibility, an ALJ may use ordinary techniques of credibility evaluation, such as considering the claimant's reputation for truthfulness and any inconsistent statements in her testimony.") (citation and internal quotation marks omitted); *Osley v. Commissioner of Soc. Sec.*, No. 12-12279, 2013 WL 3456963, at *8 (E.D. Mich. July 9, 2013) (administrative law judge did not err in taking plaintiff's criminal history into account in making adverse credibility finding when (i) a claimant's criminal history is relevant to his or her credibility and, (ii) although the

administrative law judge did not mention the duration and nature of that history, it was not his sole basis for his credibility finding).

Assuming *arguendo* that, either as a general matter or in view of his lack of explication, the administrative law judge could not have relied solely on the plaintiff's criminal history in making his adverse credibility determination, he nonetheless properly took it into account.[5] That history, combined with the extensive record evidence that the plaintiff was not forthcoming and overreported symptoms, adequately supports the administrative law judge's adverse credibility finding. There is, thus, no basis on which to disturb it.

### B. Omissions from Mental RFC

The plaintiff next faults the administrative law judge for failing to find that he suffered from impulsivity and low stress tolerance, leading to aggressive and maladaptive behaviors that would preclude sustained employment with most employers. *See* Statement of Errors at 3-5. He relies on certain testimony at hearing of impartial medical expert James Claiborn, Ph.D., that he argues supports this finding. *See id*.

In response to questions from the administrative law judge, Dr. Claiborn testified that the plaintiff retained the capacity to remember/understand simple to moderately detailed instructions, execute simple to moderately detailed tasks on a day-to-day basis within an ordinary workweek, interact with supervisors or co-workers, but not in a cooperative manner, although he could not interact with the public, and adapt to occasional changes in the workplace. *See* Record at 73-74.

---

[5] I take judicial notice that, in Maine, unlawful sexual contact with a stepchild who is less than 18 years old is a Class C crime. *See* 17-A M.R.S.A. § 255-A(1)(M). A Class C crime is punishable by a term of imprisonment not to exceed five years. *See id*. § 1252(2)(C). This fairly can be described as a crime of moral turpitude.

10

Nonetheless, the plaintiff suggests that Dr. Claiborn's testimony on cross-examination indicated that "even the lowest stress job imaginable would not necessarily prevent [the plaintiff] from engaging in aggressive and maladaptive behavior, based on his own internal perceptions and misconceptions, which behavior would prevent him from functioning appropriately, effectively, and on a sustained basis in the employ of most employers." Statement of Errors at 5. In so arguing, the plaintiff reads too much into the Claiborn testimony.

As the plaintiff points out, *see id* at 4-5, Dr. Claiborn agreed on cross-examination that the plaintiff "may have what is described as low distress [sic] tolerance[,]" which is consistent with a personality disorder, Record at 79, "has difficulty handling perceived stress," sometimes leading to conflicts in which he is "responding to some idiosyncratic notions on his part[,]" *id.* at 79, 91, "has an impulse problem[,]" *id.* at 88, "probably doesn't control [his impulses] very well much of the time[,]" *id.*, and meets the criteria for a borderline personality disorder, demonstrating "impulsivity in at least two areas, potentially damaging, spending, sex, substance abuse, reckless driving and binge eating[,]" *id.* at 102.

However, Dr. Claiborn never stated that any of these traits compromised the work capacities that he had initially testified the plaintiff possessed or that they would effectively prevent him from functioning appropriately and effectively on a sustained basis in the employ of most employers. *See id.* at 75-105. Indeed, on initial cross-examination, when Dr. Claiborn testified that, if exposed to more than occasional change, the plaintiff might become irritated, leave the workplace, or fall into a conflict with someone, he reiterated that he expected the plaintiff to be able to tolerate occasional changes. *See id.* at 75-76.

At oral argument, the plaintiff's counsel acknowledged that Dr. Claiborn did not clarify whether these problems would or would not alter his initial RFC opinion and that neither he nor

11

the administrative law judge asked him whether they would. Nevertheless, he argued that Dr. Claiborn's testimony placed the question before the administrative law judge, who could not permissibly ignore it. As noted above, it was the plaintiff's burden at Step 4 to prove his RFC. *See, e.g.*, *Sawyer,* 2013 WL 1760534, at *4. The plaintiff's counsel did not ask Dr. Claiborn to clarify whether the problems discussed on cross-examination altered his initial RFC opinion. On the evidence available to him, the administrative law judge permissibly found that RFC opinion unaltered.

The plaintiff, therefore, falls short of demonstrating that the administrative law judge omitted restrictions supported by Dr. Claiborn's testimony.

### C. Application of Wrong Legal Standard

The plaintiff next contends that "[t]here is a serious question as to whether either the ALJ or Dr. Claiborn applied the correct standard for assessing impairment in social function." Statement of Errors at 6. Social Security regulations provide, in relevant part:

> *Social functioning* refers to your capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals. Social functioning includes the ability to get along with others, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers. You may demonstrate impaired social functioning by, for example, a history of altercations, evictions, firings, fear of strangers, avoidance of interpersonal relationships, or social isolation. You may exhibit strength in social functioning by such things as your ability to initiate social contacts with others, communicate clearly with others, or interact and actively participate in group activities. We also need to consider cooperative behaviors, consideration for others, awareness of others' feelings, and social maturity. Social functioning in work situations may involve interactions with the public, responding appropriately to persons in authority (e.g., supervisors), or cooperative behaviors involving coworkers.
>
> We do not define "marked" by a specific number of different behaviors in which social functioning is impaired, but by the nature and overall degree of interference with function. For example, if you are highly antagonistic, uncooperative, or hostile but are tolerated by local storekeepers, we may nevertheless find that you have a marked limitation in social functioning because that behavior is not acceptable in other social contexts.

Appendix 1 to Subpart P, 20 C.F.R. § 404 (the "Listings"), § 12.00(C)(2).

With respect to the administrative law judge's understanding of the regulations, the plaintiff relies on the following colloquy between his counsel and the administrative law judge during his counsel's cross-examination of Dr. Claiborn:

> A. I don't [think] that they were perceived conflicts with anyone as much as he was responding to some idiosyncratic notions on his part. I don't really know what those were.
>
> Q. But you know that they led him almost ever[y] day to leave work early?
>
> ALJ: No, we don't know that, Mr. Beal. That is the subjective statement that is up to me to weigh in terms of credibility. In evaluating social functioning under the B criteria, it's not just based upon how many friends one has, but how one interacts with others in a variety of situations.
>
> \*\*\*
>
> ALJ: I think that one of the important questions is in this record, is there really any indication that [the plaintiff] has difficulty interacting with the numerous medical providers he's seen over the number of years or the professionals that he saw in jail. We have the one confirmed report of the difficulty [that got] him placed into seclusion, but I think there is possibly a lot of evidence that [Dr.] Claiborn would be able to rely upon that [the plaintiff] has adequate social skills to be able to interact with others.
>
> ATTY: With all due respect, Your Honor, I think the interaction with jail officials or medical providers are not the kind of social interactions which the social security regulations are addressed to.
>
> ALJ: I disagree. It's the ability to interact with others.

Record at 91-92.

The plaintiff cites *Lancellotta v. Secretary of Health & Human Servs.*, 806 F.2d 284 (1st Cir. 1986), for the proposition that the ability to interact successfully with doctors or, presumably, jailors is not probative of the ability to function socially. Statement of Errors at 6 n.3. He argues that, in focusing on the plaintiff's interactions with doctors and jail personnel, the administrative law judge failed to consider or review his "history of altercations, evictions,

firings, fear of strangers, avoidance of interpersonal relationships, [and] social isolation" and "history of assaultive behavior, sexual abuse of a minor and of a dog, and other evidence throughout the record supporting a finding of a marked limitation in social functioning because [the plaintiff's] behavior is not acceptable in other social contexts." Statement of Errors at 7-8 (internal quotation marks omitted). He adds that the administrative law judge overlooked evidence of difficulties interacting even with doctors and jail personnel despite describing them in his recitation of the record evidence. *See id*. at 8. He allows that, "[p]ossibly, the ALJ could have explained his understanding of the assessment of social impairment had he made the actual credibility determinations he said he would." *Id*.

I find no error. First, the administrative law judge correctly described social functioning as the ability to interact with others. *Lancellotta* does not suggest that a claimant's ability to get along with medical providers is irrelevant but, rather, that "a claimant's ability to visit doctors and describe his medical problems coherently [is] insufficient evidence of his ability to work." *Lancellotta*, 806 F.2d at 285. In *Lancellotta*, the administrative law judge had "apparently relied upon Lancellotta's even demeanor at the disability hearing as evidence of his ability generally to work at low-stress jobs" and had failed to ask the medical advisor who testified at hearing to describe the extent to which the claimant's mental impairment affected his ability to meet the basic mental demands of competitive, remunerative, unskilled work. *Id*. at 285-86.[6] Here, the administrative law judge asked Dr. Claiborn to describe the plaintiff's ability to meet each of

---

[6] Those demands are that a person "understand, carry out, and remember simple instructions; . . . respond appropriately to supervision, coworkers, and usual work situations; and . . . deal with changes in a routine work setting." *Lancellotta*, 806 F.2d at 286. *See also* Social Security Ruling 85-15 ("SSR 85-15"), reprinted in *West's Social Security Reporting Service* Rulings 1983–1991 (1992), at 347 (same).

14

those demands, and Dr. Claiborn did so. *See* Record at 73-74. Moreover, there is no expert evidence of record that the plaintiff suffered from a marked impairment in social functioning.[7]

Second, as discussed above, the administrative law judge did not fail to make credibility findings. He made clear that he did not find the plaintiff credible with respect to asserted limitations in social functioning that were inconsistent with those found in his RFC determination.

Third, while the plaintiff states that the administrative law judge noted "antagonistic and uncooperative behaviors" in interacting with medical and jail personnel but failed to take them into account, Statement of Errors at 8, the administrative law judge described only one arguably "antagonistic" behavior directed to treating providers: that the plaintiff was noted by Dr. Hallee, on mental status examination on January 22, 2009, to have a "potentially threatening" posture and a "somewhat somber" mood, Record at 19. That noted behavior, in itself, does not suggest a marked restriction in social functioning. The "uncooperative" behaviors consisted of failing to be forthcoming and exaggerating symptoms, *see id*. at 17-19, which the administrative law judge did take into account, finding that they cut against the plaintiff's credibility, *see id*. at 17.

With respect to Dr. Claiborn's understanding of the regulations, the plaintiff argues that, at hearing, Dr. Claiborn gave a definition that "does not fairly encompass the criteria required in

---

[7] No treating source submitted an opinion as to the plaintiff's mental RFC. The record contains the opinions of two examining consultants, Drs. Freedman and Hansen, and three nonexamining consultants, Dr. Claiborn, Scott W. Hoch, Ph.D., and Brenda Sawyer, Ph.D. *See* Record at 73-74, 392-406, 682-95, 758-60, 781-97. In a psychiatric review technique form ("PRTF") dated October 10, 2008, Dr. Hoch found insufficient evidence to evaluate the severity of the plaintiff's mental impairments either before or after his date last insured. *See* Record at 682. In a report dated March 27, 2009, Dr. Freedman stated that the plaintiff had "some problems with sociability" but "appear[ed] to be adapt [sic] to circumstances in some regard, except for accessing mental health services." *Id*. at 760. Dr. Freedman noted that, while the plaintiff alleged difficulties coping with chronic auditory hallucinations, "no outward behavioral signs of auditory hallucinations were observed during this interview." *Id*. In a PRTF dated April 16, 2009, Dr. Sawyer found that the plaintiff had moderate difficulties in social functioning, *see id*. at 791, and, in a mental RFC assessment of the same date, she determined that he had "adequate social skills to interact with co-workers and supervisors" but not with the public, *id*. at 797. In a report of a psychological evaluation dated August 5, 2009, Dr. Hansen noted difficulties with inhibition and problem-solving that may have been exacerbated by the plaintiff's imprisonment. *See id*. at 400.

15

the Regulations," as a result of which his opinion as to the plaintiff's degree of impairment in social functioning should not be "deemed controlling." Statement of Errors at 7.

Dr. Claiborn testified: "Marked social dysfunction would occur if [the plaintiff] were unable to manage contact with other people in ways that involve getting into conflicts or things like that repeatedly in ordinary situations." Record at 90. The plaintiff fails to explain, and I do not see, how this definition runs afoul of the controlling regulation. *See* Statement of Errors at 7. In any event, to the extent that the plaintiff may mean to imply that Dr. Claiborn overlooked "highly antagonistic, uncooperative, or hostile" behaviors that might have been tolerated in some settings but were not acceptable in others, Listings § 12.00(C)(2), any error is harmless. As discussed above, the administrative law judge supportably discredited the plaintiff's allegations that he engaged in such behaviors, except to the extent consistent with his RFC determination.

### D. Failure To Take Into Account Effects of Stress

The plaintiff's next point of error, that the administrative law judge failed to make supportable findings as to his ability to handle stress at work, *see* Statement of Errors at 8-11, overlaps with the first three.

The plaintiff correctly notes, *see id*. at 9-10, that:

1. *Lancellotta* calls for an examination of "the nature of [a claimant's] stress, the circumstances that trigger it, [and] how those factors affect his ability to work[,]" *Lancellotta*, 806 F.2d at 285.

2. This court has deemed the requirement to take into account the effects of stress satisfied when an administrative law judge assesses the effect of a mental impairment on "the claimant's ability to understand, carry out, and remember simple instructions; respond appropriately to supervision, coworkers, and customary work situations; and to deal with

16

changes in a routine work setting[,]" *Mason v. Astrue*, Civil No. 08-17-B-W, 2008 WL 4822238, at *4 (D. Me. Nov. 4, 2008) (rec. dec., *aff'd* Nov. 25, 2008).

However, he argues that this case does not involve mere difficulty with "stress." *See* Statement of Errors at 10. Rather, in his view, the administrative law judge purported to adopt the RFC opinion of Dr. Claiborn while ignoring traits that Dr. Claiborn, on cross-examination, agreed existed: his impulsivity and inability to handle perceived stress. *See id*. He contends that the administrative law judge then failed to make the requisite findings as to the likely triggers to, and degree and severity of, his impulsivity and difficulty handling perceived stress. *See id*. at 10-11.

For the reasons discussed above, this point is without merit. Dr. Claiborn never testified that the plaintiff's impulsivity and difficulty handling perceived stress imposed restrictions beyond those included in his RFC opinion. The administrative law judge adopted that opinion, and made the inquiries required by *Lancellotta* and *Mason*. As counsel for the commissioner contended at oral argument, this case, like *Justason v. Barnhart*, No. 05-55-P-C, 2005 WL 3263934 (D. Me. Nov. 30, 2005) (rec. dec., *aff'd* Jan. 26, 2006), "is materially distinguishable from *Lancellotta* in that the administrative law judge did not simply find (and posit to the vocational expert) that the plaintiff required a 'low-stress' job." *Justason*, 2005 WL 3263934, at *5. "Rather, he defined the parameters of 'low stress[.]'" *Id*.

### E. Failure To Address Testimony of Vocational Expert on Cross-Examination

A vocational expert present at the plaintiff's hearing testified that a person with the RFC outlined by the administrative law judge could perform the jobs of garbage collector and vehicle cleaner. *See* Record at 109-10. The plaintiff complains that the administrative law judge ignored testimony of the vocational expert indicating that, "even among garbage collectors and

car cleaners, employers will not tolerate an employee who sees black figures which prevent him from doing his assignments, or an employee who periodically interprets a glance or look of another person as hostile or threatening, and where this results in his feeling a necessity to either avenge [defend] himself by attacking them or leave the situation." Statement of Errors at 13 (brackets in original); *see also* Record at 112-13, 115-18. The plaintiff asserts that, to meet the commissioner's Step 5 burden, the administrative law judge "should have determined whether [the plaintiff] was or was not subject to these behaviors." *Id*. at 13-14.

This argument hinges on the success of the plaintiff's first two points of error, which I have found to be without merit. Dr. Claiborn never testified that the plaintiff's impulsivity and difficulty handling perceived stress imposed restrictions beyond those included in his RFC opinion. The administrative law judge, in turn, adopted the Claiborn RFC opinion and made clear that he discredited the plaintiff's allegations of limitations greater than those set forth in the RFC determination.

### F.  Error in Determining That Plaintiff Engaged in SGA in 2006

The plaintiff finally complains that the administrative law judge erred in finding that he engaged in SGA after March 31, 2005, his date last insured, as a result of which he was not disabled as of that time. *See* Statement of Errors at 14-16. At oral argument, counsel for the commissioner conceded the error, but argued that it is harmless because the administrative law judge found, in the alternative, that there was insufficient evidence to establish that the plaintiff was disabled before his date last insured. *See* Record at 21. I agree that the error is harmless.

At oral argument, the plaintiff's counsel contended that the alternative finding did not render the error harmless because both Drs. Claiborn and Freedman addressed the plaintiff's condition prior to his date last insured. He reasoned that if the court determined that the

administrative law judge's RFC finding was unsupported by substantial evidence, the entire period should be reopened on remand for analysis under proper standards.

Counsel for the commissioner rejoined that Drs. Claiborn and Freedman at most generally considered the plaintiff's condition over time but cited no specific records from the period prior to his date last insured. She pointed out that it was the plaintiff's burden, for purposes of his SSD claim, to establish that he was disabled prior to that time.

Dr. Freedman's report does not help the plaintiff: he nowhere states that the plaintiff's diagnoses or symptoms existed prior to his date last insured. *See id*. at 758-61. Dr. Claiborn did testify that the plaintiff in all likelihood suffered from borderline personality disorder since before 2005. *See id.* at 105. However, even assuming *arguendo* that this testimony provided sufficient evidence to find that the plaintiff's symptoms predated his date last insured, remand would be an empty exercise. I have found, for the reasons discussed above, that the administrative law judge supportably determined that the plaintiff was capable of performing jobs existing in significant numbers in the national economy from his date last insured through the time of his decision. Based on Dr. Claiborn's testimony, the same would be true of the period prior to the plaintiff's date last insured. *See Day v. Astrue*, No. 1:12-cv-141-DBH, 2012 WL 6913439, at *11 (D. Me. Dec. 30, 2012) (rec. dec., *aff'd,* Jan. 18, 2013) ("Pursuant to the rule of *SEC v. Chenery Corp.,* 332 U.S. 194 (1947), a reviewing court cannot affirm an agency's decision on the basis of a *post hoc* rationalization but must affirm, if at all, on the basis of a rationale actually articulated by the agency decision-maker. An exception to the *Chenery* rule exists when a remand will amount to no more than an empty exercise because, for example, application of the correct legal standard could lead to only one conclusion.") (citations and internal punctuation omitted).

## II. Conclusion

For the foregoing reasons, I recommend that the decision of the commissioner be **AFFIRMED**.

*NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within fourteen (14) days after being served with a copy thereof. A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 31st day of December, 2013.

/s/ John H. Rich III
John H. Rich III
United States Magistrate Judge